FILED

2022 Sep-15  AM 11:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

ANTOINE LASHUN JOHNSON,      )
                               )
         Plaintiff,                 )
                               )
     vs.                         )     Case No.  1:20-cv-02039-HNJ
                               )
COMMISSIONER, SOCIAL SECURITY    )
ADMINISTRATION,                )
                               )
         Defendant.            )

## MEMORANDUM OPINION

Plaintiff Antoine Lashun Johnson seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for a period of disability and disability insurance benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 15).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii),

404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11ᵗʰ Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11ᵗʰ Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. § 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also* 20 C.F.R.

§ 404.1520(g).  If the claimant cannot perform other work, the evaluator will find the claimant disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).  Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)).  Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." . . .  "Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

4

## FACTUAL AND PROCEDURAL HISTORY

Mr. Johnson, age 34 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability insurance benefits on September 10, 2019, alleging disability as of September 1, 2018. (Tr. 179-80). The Commissioner denied his claims, and Johnson timely filed a request for hearing on December 26, 2019. (Tr. 80, 110-11). An Administrative Law Judge ("ALJ") held a hearing on June 11, 2020. (Tr. 45-66). The ALJ issued an opinion on July 1, 2020, denying Johnson's claim. (Tr. 7-21).

Applying the five-step sequential process, the ALJ found at step one that Johnson did not engage in substantial gainful activity after September 1, 2018, his alleged disability onset date. (Tr. 12). At step two, the ALJ found Johnson manifested the severe impairments of degenerative disc disease; hip disorder, including trochanteric bursitis; obesity; depressive disorder; posttraumatic stress disorder ("PTSD"); and alcohol addiction disorder. (*Id.*) At step three, the ALJ found that Johnson's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13).

Next, the ALJ found that Johnson exhibited the residual functional capacity ("RFC") to perform light work, with the additional limitations:

> The claimant can lift, carry, push and pull up to twenty pounds occasionally and ten pounds frequently. With normal breaks in an eight-hour day, he can sit for six hours, and stand and/or walk for six hours.

He can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; and can occasionally balance, stoop, kneel, crouch, and crawl. The claimant should avoid all exposure to dangerous hazards, such as unprotected heights and moving machinery. He can understand, remember, and complete simple instructions; can concentrate and persist on these tasks for at least two hours at a time; can acceptably relate with coworkers and supervisors on an occasional basis but should have no direct contact with the public and would work better with things than with people; and can adapt to occasional simple work changes in routine. The claimant requires a cane to ambulate but can use his free hand to lift and carry.

(Tr. 14).

At step four, the ALJ determined Johnson did not retain the ability to perform his past relevant work as an infantry person, soldier, spray painter, department head, or forklift operator. (Tr. 20). At step five, the ALJ determined that, considering Johnson's age, education, work experience, and RFC, a significant number of other jobs exist in the national economy that he could perform. (*Id.*) Accordingly, the ALJ determined that Johnson has not suffered a disability, as defined by the Social Security Act, since September 1, 2018. (Tr. 21).

Johnson timely requested review of the ALJ's decision. (Tr. 176-78). On October 27, 2020, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1-3). On December 18, 2020, Johnson filed his complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Johnson argues the ALJ failed to consider his obstructive sleep apnea ("OSA") as a severe impairment, failed to find that he has an impairment that

6

meets or medically equals an impairment listed in 12.15, improperly considered the Veterans Affairs disability determination, improperly evaluated the medical evidence, and failed to consider his nightmares and other sleep disturbances.  For the reasons discussed below, the undersigned concludes those contentions do not warrant reversal.

## I.    The ALJ Did Not Err by Declining to Deem Johnson's Obstructive Sleep Apnea a Severe Impairment

At step two of the sequential evaluation process, the ALJ found Johnson manifested the severe impairments of degenerative disc disease; hip disorder, including trochanteric bursitis; obesity; depressive disorder; PTSD; and alcohol addiction disorder.  (Tr. 12).  Johnson argues the ALJ should also have adjudged his obstructive sleep apnea as a severe impairment.

Step two of the sequential evaluation process, during which the ALJ considers the medical severity of a claimant's impairments, constitutes a "'threshold inquiry' and 'allows only claims based on the most trivial impairments to be rejected.'" *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1264-65 (11th Cir. 2019) (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004); *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986)).

An impairment or combination of impairments manifests as "non-severe" if it "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522(a).  The term "basic work activities" refers to "the abilities and aptitudes necessary to do most jobs," including:

     (1)     Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

     (2)     Capacities for seeing, hearing, and speaking;

     (3)     Understanding, carrying out, and remembering simple instructions;

     (4)     Use of judgment;

     (5)     Responding appropriately to supervision, co-workers and usual work situations; and

     (6)     Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b).  Thus, an ALJ should characterize an impairment as non-severe "only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Schink,* 935 F.3d at 1265 (citing *McDaniel*, 800 F.2d at 1031).

The ALJ did not include obstructive sleep apnea among Johnson's severe impairments because he assessed the condition as "well controlled with CPAP titration," and there exists "no evidence of significant limitations that stem from this condition." (Tr. 13).  Johnson disputes that finding, as he "has a history of sleep disturbance, daytime sleepiness, and snoring for which sleep studies revealed a diagnosis of sleep apnea." (Doc. 16 at 14).

To the contrary, the mere diagnosis of sleep apnea does not necessarily connote a disabling impairment, or even a severe impairment, as the functional effect of a claimant's impairments, not the mere existence of the impairments themselves, governs

the assessment of an impairment.  *See Moore,* 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen,* 791 F.2d 1544, 1547 (11th Cir. 1986)) ("To a large extent, Moore questions the ALJ's RFC determination based solely on the fact that she has varus leg instability and shoulder separation.  However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard."); *Mansfield v. Astrue,* 395 F. App'x 528, 531 (11th Cir. 2010) (finding diagnosis insufficient to establish disability); *Osborn v. Barnhart,* 194 F. App'x 654, 667 (11th Cir. 2006) (While a doctor's letter reflected diagnoses, "it does not indicate in any way the limitations these diagnoses placed on [the claimant's] ability to work, a requisite to a finding of disability.").

Moreover, the diagnosis of sleep apnea preceded Johnson's treatment with a CPAP machine, which adequately controlled his symptoms.  During the administrative hearing, the ALJ asked Johnson whether he could sleep with his CPAP, and Johnson responded, "I don't have any problems.  The only problems I have is the nightmares." (Tr. 58).

Johnson also asserts "[h]is snoring and fatigue have been noted to be severely increased with PTSD symptoms."  (Doc. 16 at 14).  As the record portrays, Johnson asked the VA medical clinic on March 25, 2020, "if [the] provider who read his sleep study results would be agreeable to providing a letter stating that his service-connected disability of PTSD aggravates his Obstructive Sleep Apnea because studies have shown that PTSD symptoms severity increased the risk of snoring and fatigue."  (Tr. 449).

On March 30, 2020, Dr. Ripu Jindal, the attending physician, stated in a treating

note:

> As per records, I read the veteran's sleep study in 2018.  Sleep apnea is
> common among veterans with PTSD.  There is also evidence that PTSD
> makes it difficult to treat sleep apnea.  Patients with PTSD seem to be
> more likely to have difficulty tolerat[ing] the mask for positive pressure
> therapy, which is the commonest form of treatment for sleep apnea.
> There is also evidence to suggest that untreated sleep apnea can adversely
> affect PTSD.

(*Id.*).

On March 31, 2020, Mauricia C. Timmons, a Psychiatric Mental Health and

Family Nurse Practitioner for the Department of Veterans Affairs, wrote a letter

remarking:

> Mr. Johnson served on active duty in the U.S. Marine Corps.  He is
> currently service-connected for PTSD at 50%.  Veteran has been
> diagnosed with obstructive sleep apnea by Dr. R. Jindal, psychiatrist,
> BVAMC, Sleep Clinic, treated by Continuous Positive Airway Pressure
> (CPAP) since April 18, 2018.  The veteran's service-connected PTSD is
> related to a motor vehicle accident (MVA) which occurred while serving
> on active duty.   MVA resulted in loss of consciousness (LOC)
> approximately 3 hours.  Veteran was symptomatic for retrograde amnesia
> and post-traumatic amnesia.
>
> The PTSD symptoms suffered by Mr. Johnson includes [sic] flashbacks,
> nightmares, intrusive thoughts/memories, re-experiencing the trauma,
> avoiding thoughts/feeling regarding accident, inability to remember
> trauma details, anhedonia, irritability, decreased concentration,
> hypervigilance, and hyper-startle response.  Veteran's obstructive sleep
> apnea is more likely than not secondary to his service-connected PTSD.
>
> Researchers have shown an increase in the intensity and frequency of sleep
> disturbances with active duty personnel and veterans diagnosed with
> PTSD.  Medical literature strongly supports a correlation between sleep
> apnea and PTSD.

(Tr. 715).

The ALJ considered Ms. Timmons' letter, but he observed that "Ms. Timmons' notation of the association between the two conditions is not really an opinion regarding the claimant's capabilities and is simply noted as a statement that has been considered in formulating this decision." (Tr. 19). The ALJ correctly characterized the letter as providing only generalizations about the connection between obstructive sleep apnea and PTSD, not any specific assessments about the limitations Johnson suffered as a result of the apnea. The record contains Johnson's repeated reports of sleep disturbances, but he attributed those disturbances to nightmares, not to obstructive sleep apnea. (Tr. 229-30, 328, 559, 567, 647, 709). VA monitoring notes report that the CPAP device improved Johnson's condition. (Tr. 346, 355, 529, 711).

The record contains no evidence that Johnson's obstructive sleep apnea causes limitations in his ability to perform work activities. Therefore, substantial evidence supports the ALJ's finding that obstructive sleep apnea did not constitute a severe impairment. *See Freeman v. Comm'r, Soc. Sec. Admin.*, 593 F. App'x 911, 914 (11th Cir. 2014) ("Mr. Freeman has not cited to any medical evidence showing that his back pain significantly limits his ability to perform work activities.").

## II.   The ALJ Did Not Err by Finding Johnson Does Not Have an Impairment That Meets or Medically Equals an Impairment Listed in 12.15

At step three of the sequential evaluation process, the ALJ found Johnson's "mental impairments, considered singly and in combination, do not meet or medically

equal the criteria of listing[ ] . . . 12.15." (Tr. 13). Johnson argues he has mental impairments that meet or equal the listing.

Listing 12.15 describes "[t]rauma- and stressor related disorders" as

disorders . . . characterized by experiencing or witnessing a traumatic or stressful event, or learning of a traumatic event occurring to a close family member or close friend, and the psychological aftermath of clinically significant effects on functioning. Symptoms and signs may include, but are not limited to, distressing memories, dreams, and flashbacks related to the trauma or stressor; avoidant behavior; diminished interest or participation in significant activities; persistent negative emotional states (for example, fear, anger) or persistent inability to experience positive emotions (for example, satisfaction, affection); anxiety; irritability; aggression; exaggerated startle response; difficulty concentrating; and sleep disturbance.

20 C.F.R. 404, Subpt. P, App. 1, Pt. A2 § 12.00(B)(11).

Listing 12.15 requires a claimant to satisfy two distinct subparts:

A. Medical documentation of all of the following:

   1. Exposure to actual or threatened death, serious injury, or violence;

   2. Subsequent involuntary re-experiencing of the traumatic event (for example, intrusive memories, dreams, or flashbacks);

   3. Avoidance of external reminders of the event;

   4. Disturbance in mood and behavior; and

   5. Increases in arousal and reactivity (for example, exaggerated startle response, sleep disturbance).

AND

B. Extreme limitation of one, or marked limitation of two, of the

following areas of mental functioning (see 12.00F) [2]:

    1.  Understand, remember, or apply information (see 12.00E1).

    2.  Interact with others (see 12.00E2).

    3.  Concentrate, persist, or maintain pace (see 12.00E3).

    4.  Adapt or manage oneself (see 12.00E4).

OR

C.  Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

    1.  Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

    2.  Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. 404, Subpt. P, App. 1, Pt. A2 §§ 12.15(A)-(C).

The ALJ first considered whether Johnson's mental impairments satisfied the criteria set forth in paragraph B.  The ALJ stated,

> In understanding, remembering or applying information, the claimant has a moderate limitation. The claimant can live independently and attend to his finances without assistance. (See 4E and 6E).

---

[2] Extreme limitation refers to an inability "to function in [the particular] area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. 404, Subpt. P, App. 1, Pt. A2 § 12.00(F)(2)(e).  Marked limitation denotes "functioning in [the particular] area independently, appropriately, effectively, and on a sustained basis is seriously limited."  *Id.* at § 12.00(F)(2)(d).

He apparently can shop, drive, and prepare simple meals as well. Despite some intrusive thoughts, problems in this area appear to be moderate.

In interacting with others, the claimant has a moderate limitation. The claimant has cited problems with anger and periodic outbursts at times. However, he indicated that he has friends from the military and cousins who understand him and that he goes out occasionally and attends church regularly. (See Exhibit 5F). Problems in this area appear to be moderate.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant's activities, including caring for others, shopping, driving, and managing his home and self-care, indicates that, despite some preoccupation with past trauma, he experiences at most moderate limitation in this area.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant is independent with self-care and provides care for others as well. (See Exhibits 4E and 6E). He is able to prepare meals, manage money, and shop without assistance. Overall, problems in this area appear to be moderate.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 13-14).

The ALJ also consider whether Johnson's mental impairments met the criteria in

paragraph C:

In this case, the evidence fails to establish the presence of the "paragraph C" criteria. There is nothing in the record that suggests that the claimant requires an ongoing, highly structured setting due to his mental health issues or that a change in his environment would cause any type of failure to adjust.

(Tr. 14).

In response, Johnson contends the ALJ failed "to cite any expert opinion or

14

medical evidence to support his moderate limitations in all areas of functioning, apparently relying instead on [his] own interpretation of the testimony and reports of daily living without direct citation to the record." (Doc. 18 at 7-8). To the contrary, substantial evidence depicts the ALJ properly considered Johnson's disability status under Listing 12.15.

On June 20, 2019, Suzanne Fischer, Ph.D., in a VA Disability Benefits Questionnaire, diagnosed Johnson with PTSD and opined he suffered no other mental disorder. (Tr. 201, 203, 214). Dr. Fischer noted Johnson's PTSD causes "[o]ccupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation." (Tr. 203). As symptoms of PTSD, Dr. Fischer also found that Johnson suffers from depressed mood, anxiety, chronic sleep impairment, mild memory loss, short and long term memory impairment, disturbances of motivation and mood, and difficulty in establishing and maintaining effective work and social relationships. (Tr. 209-10).

However, Dr. Fischer did not find that Johnson exhibited near-continuous panic or depression affecting his ability to function independently, appropriately, and effectively. Furthermore, Dr. Fischer did not believe Johnson manifested circumstantial, circumlocutory, or stereotyped speech; intermittently illogical, obscure, or irrelevant speech; difficulty in understanding complex demands; impaired judgment; impaired abstract thinking; gross impairment in thought process or communication;

difficulty adapting to stressful circumstances, including work or a work like setting; the inability to establish and maintain effective relationships; obsessional rituals which interfere with routine activities; impaired impulse control; grossly inappropriate behavior; or intermittent inability to perform activities of daily living.  (Tr. 209-10).

Dr. Fischer also documented that Johnson arrived at the appointment on time and unaccompanied.  (Tr. 210).  In addition, she observed Johnson established good eye contact during the interview and described him as being verbal, animated, bright, smiling, and laughed easily.  (*Id.*).  Johnson, though, reported he "sees dead people." (*Id.*).

Upon review of Johnson's medical evidence, Robert Estock, M.D., opined on October 1, 2019, that Johnson suffered severe depression.  (Tr. 68-71).  Dr. Estock determined Johnson has moderate limitations in the categories of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself.  (Tr. 71-72).  Dr. Estock explained Johnson could "attend to simple 1-2 step tasks for at least 2 hours sufficient to complete an 8 [hour] work day without excessive breaks or supervisions." (Tr. 75).  Johnson also manifested the ability "to interact on a limited basis with the public and coworkers and can accept non-threatening direct supervision."  (Tr. 76). Johnson's "[w]ork demands should be mostly routine . . . [and] [c]hanges in the work place should be infrequent and gradually introduced."  (*Id.*).  Finally, Johnson "could adapt to infrequent, well explained changes . . . [and] would need help with long term

planning and goal setting but not short term planning and goal setting." (Tr. 77).

After reviewing Johnson's medical evidence, Peter Sims, M.D., determined on November 20, 2019, that Johnson suffered severe depression, trauma and stressor related disorders, and substance addiction disorders. (Tr. 82-88). Like Dr. Estock, Dr. Sims declared Johnson manifested moderate limitations in the categories of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. (Tr. 87). Dr. Sims gave the same account as Dr. Estock when explaining Johnson's mental capabilities and limitations. (Tr. 91-92).

Ms. Timmons' March 31, 2020, letter discussed "[t]he PTSD symptoms suffered by [Johnson] includes flashbacks, nightmares, intrusive thoughts/memories, re-experiencing . . . trauma, avoiding thoughts/feelings regarding the accident, inability to remember trauma details, anhedonia, irritability, decreased concentration, hypervigilance, and hyper-startle response." (Tr. 215). Yet, Ms. Timmons renders no statement regarding how these symptoms limit Johnson's mental functions or how Johnson has minimal capacity to adapt to changes because of these symptoms.

In Johnson's Function Report, he declared he lives in a house with his family. (Tr. 229). Johnson explained that when he wakes up, he feels unrested due to sleep disturbances caused by his PTSD. (*Id.*). Johnson claims he wakes up every night because he dreams of himself dying and cannot return to sleep afterwards. (Tr. 230). Johnson's unrest leads him to "lay around [sometimes]" or sit at a park. (Tr. 229).

Johnson claims he does not go out alone due to his PTSD. (Tr. 232). He described going to church every Sunday but needing someone to accompany him. (Tr. 233). Johnson then averred that he does not spend time with others and stays to himself. (Tr. 233-34). He explained that "any [little] thing makes [him] mad and trigger[s] [his] PTSD." (Tr. 234). Accordingly, Johnson reported that his impairments affect his ability to get along with others. He does not handle stress well and "act[s] down" when handling changes in his routine. (Tr. 235).

Yet, Johnson reported taking care of his kids and buying them clothes and items that they need. (Tr. 230). Johnson also prepares his own meals on a monthly basis such as hot dogs and sandwiches. (Tr. 231). It usually takes him ten minutes to prepare such meals. (*Id.*). In addition, it takes Johnson about 20 minutes to make his own bed, albeit needing encouragement to complete the task. (*Id.*). Johnson claims he does not need any reminders to take care of his personal needs and grooming, or to take his medication. (Tr. 231).

Johnson specified he goes outside once a day and that he drives or rides in a car. (Tr. 232). Johnson further stated he shops for clothes on his phone once a week. (Tr. 232). He maintains the ability to pay bills, count change, and handle a savings account. (*Id.*). Johnson, however, cannot use a checkbook or money orders because he "can[']t keep [up] with what[']s spent." (*Id.*).   (*Id.*).

Johnson also concurred in his Function Report that he "get[s] along" with authority figures, and he reported never experiencing a discharge from a job due to

"problems getting along with other people." (Tr. 235). Johnson conveyed that he can concentrate for two hours but does not finish what he starts. (Tr. 234). He also opined good proficiency at following written and spoken instructions. (*Id.*).

Johnson's mother also completed a Third-Party Function Report. Johnson's mother stated that she spends all day with Johnson and that they talk. (Tr. 249). Johnson's mother's Report largely reiterates the responses of Johnson's Function Report. (*See* tr. 249-59). Johnson's mother's Report differs in that she claims Johnson needs to be reminded "once or twice" to go places; he gets along "ok" with authority figures "as longs as they don't trigger his PTSD;" he handles stress "badly" and handles changes in his routine "ok;" and she does not mention that Johnson goes to church. (Tr. 253, 255).

Based upon the foregoing review, substantial evidence supports the ALJ's assessment that the record does not demonstrate extreme limitations or marked limitations in Johnson's mental functions, or that Johnson manifests a minimal capacity to adapt to changes. Thus, substantial evidence supports the ALJ's finding that Johnson does not have an impairment that meets or medically equals an impairment listed in 12.15.

## III.  The ALJ Properly Considered Johnson's VA Disability Rating and the Medical Opinions from Dr. Fischer and Ms. Timmons

Effective March 27, 2017, the Social Security Administration revised its regulations regarding the consideration of other agencies' opinions:

> Other governmental agencies and nongovernmental entities – such as the Department of Veterans Affairs . . . – make disability, blindness, employability, Medicaid, workers' compensation, and other benefits decisions for their own programs using their own rules. Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules. Therefore, in claims filed (see § 404.614) on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4).

20 C.F.R. § 404.1504.

Johnson acknowledges the new regulation governs his claim, but he suggests case law decided under the previous regulation may still apply. (Doc. 16 at 16-17) ("Prior to these new regulations, case law in the 11th Circuit provided that a disability rating from the VA should [be] treated as 'evidence that should be given great weight.' . . . While it remains unclear how that long standing caselaw will be interpreted under the regulations at 20 C.F.R. § 404.1504, this does not mean [the] ALJ is now permitted to completely disregard the VA determination and underlying medical evidence upon which that determination was based."). However, Supreme Court and Eleventh Circuit authority dictates that any previous case law requiring deference to – or even discussion of – another agency's decision does not apply under the revised regulatory scheme.

A court must afford an agency's interpretation of a statute "substantial deference

. . . 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-845 (1984); *United States v. Mead Corp.,* 533 U.S. 218, 226-227 (2001)).   "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

Previous authority does not indicate the rule requiring reviewers to afford great weight to other agencies' decisions derived directly from the language of the Social Security Act.  To the contrary, the Social Security Act grants the agency "considerable authority" to issue interpreting regulations.  *Barnhart v. Walton*, 535 U.S. 212, 225 (2002); *see also* 42 U.S.C. § 405(a) ("The Commissioner of Social Security shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.").  Johnson has not asserted that the Social Security Administration

21

lacked authority to implement the 2017 regulatory revisions, nor has he otherwise called into question the regulations' validity.

The revised regulations cannot coexist with the rule requiring deference to other agency decisions, as the revised regulations explicitly state previous agency decisions do not bind the Commissioner, and the ALJ need not provide any analysis about those other decisions. *See* 20 C.F.R. § 404.1504. Though the Eleventh Circuit has not explicitly addressed the topic, it observed in *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317 (11th Cir. 2020), that "under the new regulation the ALJ no longer analyzes the other agency's decision." *Id.* at 1324; *see also Taylor v. Kijakazi*, No. 4:20-CV-1545-AKK, 2021 WL 4820653, at *5 (N.D. Ala. Oct. 15, 2021) ("*Noble* recognizes that the newer version of 20 C.F.R. § 404.1504 applies to claims filed on or after March 27, 2017 within the Eleventh Circuit, and an ALJ no longer must give 'great weight' to agency determinations, particularly under the amended regulations – regulations that instruct the ALJ not to analyze the other agency's determination."). Consistent with this authority, the court will apply the revised regulatory requirements when assessing the relevance, if any, of the VA's determination and related records.

The VA assigned Johnson a 50-percent service-connected disability rating for PTSD effective June 29, 2017; a 50-percent service-connected disability rating for sleep apnea effective April 12, 2018; a 10-percent service-connected disability rating for right hip impairments from June 20, 2014; a 10-percent service-connected disability rating for left finger impairments from September 26, 2018; and individual unemployability

effective August 9, 2018.  (Tr. 37-45).[3]

The ALJ considered the ratings, but he noted they "reflect[] another agency's application of its own rules."  Consequently, the ratings warranted "limited evidentiary value without consideration of the supporting evidence on which the VA based its rating."  (Tr. 19).  After considering all the evidence, the ALJ found the record as a whole supported his residual functional capacity finding, rather than the VA's disability rating.

He further stated:

> I find the VA finding somewhat consistent with [the medical] evidence insofar as it suggests moderate mental limitations due to mental impairments and the ability to do light work with additional postural, environmental[, and] mental limitations.  I . . . do not find [the] VA rating in this case consistent insofar as one might interpret it to suggest total disability for several reasons.  First, as stated above, the overall medical evidence of record supports the residual functional capacity set forth in this decision.  Moreover, the VA uses a more deferential standard for evaluating the credibility of subjective complaints than the SSA. . . .  Additionally, a VA disability rating relies on a consideration of the effects of a disease or injury on a hypothetical average person's ability to earn income without consideration of a specific veteran's age, education, or work experience. . . .  In contrast, SSA provides an individualized assessment that focuses on a claimant's ability to perform work in the national economy.  As part of SSA's individualized assessment, the [Social Security Act] requires SSA to consider whether a claimant has worked; whether the impairment(s) would last at least 12 months or result in death; and the claimant's individual, specific residual functional capacity, age,

---

[3] The ALJ referenced a 50-percent rating for PTSD and a 10-percent rating for Johnson's finger and thigh conditions.  (Tr. 19).  The ALJ relied upon a September 17, 2019, treatment note from the VA medical clinic and the March 31, 2020, letter from Mauricia Timmons, the VA medical center Psychiatric Mental Health and Family Nurse Practitioner.  (Tr. 384, 715).  On April 4, 2020, prior to the ALJ's decision, the VA revised Johnson's ratings to those recited above.  (Tr. 37-45).  Even though the ALJ recited outdated ratings, the same general principles apply to the court's analysis of the ALJ's decision.

education, and work experience.  I have set out elsewhere in this decision why the claimant's mental impairments and right hip disorder are severe impairments but are not so severe as to be disabling, using SSA's standard above described.  I do not find the VA rating to be fully persuasive for those reasons.

(Tr. 19).  The revised regulations did not require the ALJ to engage in that analysis of Johnson's VA ratings; rather, they only required the ALJ to consider the supporting evidence underlying the VA's decision.[4]

Johnson asserts the ALJ failed to consider medical opinion evidence from Dr. Fischer, an examining psychologist at the VA, and Ms. Timmons, Johnson's treating therapist.  However, as previously discussed, the ALJ explicitly discussed Ms. Timmons' March 31, 2020, letter. (Tr. 19, 715).  He also alluded to the Disability Questionnaire Dr. Fischer completed on June 20, 2019.  (Tr. 16, 701-14).   Moreover, the ALJ thoroughly considered Johnson's VA medical records.  (Tr. 16-18).  Therefore, pursuant to the revised regulations, the ALJ properly considered the supporting evidence underlying the VA's disability rating decision.

## IV.   Substantial Evidence Supported the ALJ's RFC Finding

At step four of the sequential analysis the ALJ formulates a claimant's RFC by assessing his or her "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4). The claimant's RFC

---

[4] Though the ALJ did not need to address Johnson's VA ratings, the court can discern no error in his decision to do so. Rather, the ALJ's discussion is superfluous, and the relevant question under the revised regulations is whether he considered the supporting evidence underlying the VA's decision.

represents "the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Assessing a claimant's RFC lies within the exclusive province of the ALJ. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("[T]he final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner."); 20 C.F.R. §§ 404.1546(c), 416.946(c) ("[T]he administrative law judge . . . is responsible for assessing [a claimant's] residual functional capacity."); *Oates v. Berryhill*, No. 17-0130-MU, 2018 WL 1579475, at *8 (S.D. Ala. Mar. 30, 2018) ("The responsibility for making the residual functional capacity determination rests with the ALJ."); *Del Rio v. Berryhill*, No. 3:16-CV-00489-RFC, 2017 WL 2656273, at *8 (W.D. Tex. June 20, 2017) ("The ALJ has the sole responsibility of determining Plaintiff's RFC . . . .").

Social Security Ruling 96-8p dictates that an RFC assessment must first determine the claimant's functional limitations and then address the claimant's ability to work on a function-by-function basis, pursuant to the functions described in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. SSR 96-8p, 1996 WL 374184, *1. The ALJ does not need to enumerate every piece of evidence or function used in his or her determination, but rather must simply portray that he or she considered the claimant's medical conditions in totality. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009). Once the ALJ has conducted that determination, the ALJ may then express the RFC in terms of exertional levels such as sedentary, light, medium, heavy, and very heavy. SSR 96-8p, 1996 WL 374184, at *1; *see Castel*, 355 F. App'x at 263; *Freeman v.*

*Barnhart*, 220 F. App'x 957, 959 (11ᵗʰ Cir. 2007); *see also Bailey v. Astrue*, No. 5:11-CV-3583-LSC, 2013 WL 531075, *6 (N.D. Ala. Feb.11, 2013).

Johnson argues the ALJ failed to account for his purported nightmares and other sleep disturbances in the RFC determination, particularly as to excessive daytime sleepiness. Johnson's nightmares and other sleep disturbances manifest as symptoms of his PTSD impairment. In a VA Disability Benefits Questionnaire, Dr. Fischer listed chronic sleep impairment as a symptom of Johnson's PTSD and reported that Johnson has "[r]ecurrent distressing dreams in which the content and/or affect of the dream are related to . . . traumatic event(s)." (Tr. 708-09, 711). Dr. Fischer's assessment relies upon Johnson's representations as to his symptoms.

Moreover, the record portrays Johnson attributing his sleep disturbances to the nightmares he experiences. (Tr. 229, 328, 559, 567, 647). Johnson claims his nightmares portray him as dying, in a coffin, or dead. (Tr. 328, 559, 647, 705, 711). Johnson testified to experiencing these nightmares three to four times a week and sleeping "[s]omewhere around four hours" each night. (Tr. 59). He further claimed his nightmares and sleep disturbances cause him to sleep "[n]o more than 30 minutes" during the day. (*Id.*).

Hence, the question ensues whether Johnson's complaints of nightmares and sleep disturbances necessitated the ALJ's assessment of those symptoms in reaching his RFC determination.

A three-part "pain standard" applies when a claimant attempts to establish

> disability through her own testimony of pain or other subjective symptoms. *Wilson*[ v. *Barnhart*], 284 F.3d [1219,] 1225[ (11th Cir. 2002)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from that condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11th Cir. 2021). A claimant's testimony coupled with evidence that meets this standard suffice "to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted); *see also Hollingsworth v. Comm'r of Soc. Sec.*, 846 F. App'x 749, 752 (11th Cir. 2021).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, eliminates the use of the term "credibility" as it relates to assessing the claimant's complaints of subjective symptoms and clarifies that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL 1119029, *7 (Mar. 16, 2016). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons

for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms."  2016 WL 1119029 at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

In pertinent part, the ALJ assessed the following impact of Johnson's PTSD vis-à-vis the RFC determination:

> In analyzing this claim, I note that the claimant has several severe mental impairments as set forth above, including depressive disorder, PTSD, and alcohol addiction disorder, but they are not so severe as to be disabling. In 2019 and 2020, the bulk of the claimant's treatment at the VA was for his right hip condition rather than for any mental concerns. . . . The claimant's mother filled out a Third Party Function Report regarding the claimant. She wrote that she spends all day with the claimant, and they talk. She wrote that the claimant has no problems with his memory, completing tasks, concentration, understanding, or following instructions. By her account, he can pay attention for two hours at a time and is good at following written and spoken instructions. She reported that the claimant gets along well with authority figures, as long as they do not trigger his PTSD. Further, the claimant has never been fired or laid off from a job because of problems with other people. The claimant can handle changes in routine adequately and apparently does not need any special reminders to take care of his personal needs and grooming. She indicated further that he does not need help or reminders to take his medicine and that he can concentrate sufficiently to prepare his own meals, perform household chores, drive a car, and go shopping in stores once a week. Finally, the claimant can reportedly concentrate sufficiently to pay bills, count change, handle a savings account, use a checkbook, and fill out money orders. . . .

> In his function report, the claimant in [sic] gave roughly the same account as his mother, except that he unequivocally wrote that he gets along well with authority figures and that he gets out in public to go to church once a week. The claimant's other responses to other questions in his function

report were identical to the answers covered in his mother's Third Party Function Report, detailed above. . . .

Further, I note that, in his testimony regarding PTSD, the claimant acknowledged that throughout the period during which he worked in the National Guard from 2004 to 2006 and was on active duty with the military from 2006 through 2008, he was always stationed in the United States. He was never stationed overseas or in any combat situations. Consequently, I have concluded that the record fails to reflect any combat duty as a basis for the PTSD. . . . In addition, in spite of his diagnosis of PTSD based on earlier experiences from 2004 to 2008 (specifically, an apparent car accident in 2004), the claimant was evidently still able to work and earn at above substantial gainful activity levels from 2014 through 2018, at Eissmann Automotive North America. . . .

(Tr. 17).

Although the ALJ does not recount Johnson's nightmares and sleep disturbances specifically, the ALJ articulated specific reasons for discounting Johnson's subjective testimony concerning the overall intensity and severity of his PTSD and depression symptoms. The court finds substantial evidence in the record supports the ALJ's finding.

In completing the VA disability questionnaire on June 20, 2019, Dr. Fischer reviewed the VA medical evidence of Johnson's PTSD and depression symptoms. Dr. Fischer heeded the effects PTSD and depression had upon Johnson (Tr. 708-11), specifically noting Johnson's PTSD causes "[o]ccupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks. . . ." (Tr. 203, 703). However, Dr. Fischer also concluded that notwithstanding the PTSD, Johnson "generally function[ed] satisfactorily, with normal

routine behavior, self-care and conversation." (*Id*).

The medical evidence generally supports Dr. Fischer's assessment. The medical evidence records Johnson's complaints about nightmare and sleep disturbances on February 15, 2018 (Tr. 349); August 14, 2019 (Tr. 636, 647); October 17, 2019 (Tr. 574); December 18, 2019 (Tr. 567); March 19, 2020 (Tr. 521); and April 6, 2020 (Tr. 512). However, despite the February 15, 2018, medical evidence recording Johnson "had nightmares every night," it also reflected "he [was] down to 2 per month that bother him less." (Tr. 349). The August 14, 2019, medical evidence demonstrates Johnson declared "his body [was] getting used to the decreased sleep . . . and it d[id not] bother him as bad as it did." (Tr. 328). The March 19, 2020, medical evidence records Johnson as experiencing only "some sleep problems" despite his frequent nightmares. (Tr. 521). And on the subsequent April 6, 2020, evaluation, although Johnson reported only two hours of sleep per 24-hour-period, he declared his sleep quality was "even though [he did not] sleep much," and he did not "feel tired" when he awakened. (Tr. 512). He further described having "all right" energy. (*Id.*).

To be sure, the medical evidence also chronicles the sleep medication prescribed for Johnson's sleep disturbances and nightmares, spanning a period from at least June 2019 to August 2020. (*See* Tr. 376-78, 513-15, 517, 550-51, 559, 561, 610, 620, 631-32, 650). However, that same record portrays Johnson did not consistently take his medication, including during a several-month period in the second half of 2019 when Johnson regrettably confronted his mother's illness and death. (Tr. 515, 530-31, 559,

561, 581).  Johnson's history of noncompliance with medication prescribed to alleviate his nightmares and sleep disturbances blunts his claim that those alleged symptoms significantly affected his functioning.  *C.f.  Grier v. Colvin*, 117 F. Supp. 3d 1335, 1336 (N.D. Ala. 2015) ("The Commissioner may deny benefits for the failure to follow treatment when the claimant, without good reason, fails to follow a prescribed course of treatment that could restore the ability to work." (citing *Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990))).

Furthermore, Johnson described the advent of PTSD "symptoms around 2008," (tr. 211), yet as the ALJ noted, he obtained and held multiple jobs since experiencing such symptoms.  (Tr. 239, 242-47).  Moreover, Johnson declared in his Function Report that an employer has never fired him or laid him off.  (Tr. 235).  Indeed, Johnson claims his employer discharged him from his last job in 2018 due to excessive absences related to medical appointments, not for excessive daytime sleepiness due to his nightmares and sleep disturbances.  (Tr. 211, 711).  Therefore, substantial evidence supports the ALJ's RFC determination as to any functions purportedly affected by Johnson's nightmares and sleep disturbances.

Johnson also contends the "ALJ does not address or explain why Dr. Estock's [and Dr. Sims's] opinion[s] regarding limited ability to interact with coworkers and supervisors with non threatening supervision and infrequent, gradual changes in work routine were left out of the RFC."  (Doc. 16 at 21; Doc. 18 at 8).  In his ruling, the ALJ remarked:

> Dr. Robert Estock reviewed the claimant's records and opined that he experiences moderate limitations due to mood disorder. . . . Dr. Peter Sims also reviewed the claimant's records and concluded that a combination of mood disorder, personality disorder, and trauma related disorder causes moderate limitations to functioning. . . . Dr. Estock's opinion is somewhat consistent and persuasive. His failure to identify trauma related disorder as a severe problem undermines its consistency, however, since the majority of the mental health related evidence concerns this condition. It is partially persuasive. I find Dr. Sims' opinion is more persuasive, but I altered his proposed limitations to better reflect the findings of moderate difficulties with functioning.

(Tr. 19).

"'For claims filed . . . on or after March 27, 2017,' an [ALJ] must 'not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 897 (11th Cir. 2022) (first alteration in original) (quoting 20 C.F.R. § 404.1520c(a)). "Instead, the new regulation provides several factors for determining what weight to give a . . . medical opinion[]." *Id.* "Those factors include the supportability of the medical opinion, its consistency with other record evidence, the physician's relationship with the claimant, the physician's specialty, and other relevant information, such as the physician's familiarity with the other record evidence and with making a claim for disability." *Id.* (citing 20 C.F.R. § 404.1520c(c)(1)-(5)). An ALJ must only explain the role of the supportability and consistency factors in evaluating a medical opinion and may explain how he or she considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

As recounted by counsel for Johnson, both Dr. Estock and Dr. Sims determined Johnson "is able to interact on a limited basis with the public and coworkers and can

32

accept non-threatening direct supervision." (Tr. 76, 92). In addition, they concluded that "[c]hanges in [Johnson's] work place should be infrequent and gradually introduced." (*Id.*). The ALJ altered their "proposed limitations to better reflect the findings of moderate difficulties with functioning." (Tr. 19). Thus, the ALJ's RFC determination reflects Johnson "can acceptably relate with coworkers and supervisors on an occasional basis but should have no direct contact with the public and would work better with things than with people; and can adapt to occasional simple work changes in routine." (Tr. 14).

Substantial evidence supports the ALJ's decision to diverge from Dr. Estock's and Dr. Sim's proposed limitations because, as stated previously, Johnson described the advent of PTSD "symptoms around 2008," (tr. 211), yet he obtained and held multiple jobs since experiencing such symptoms. (Tr. 239, 242-47). Johnson also concurred in his Function Report that he "get[s] along" with authority figures, and he reported never experiencing a discharge from a job due to "problems getting along with other people." (Tr. 235).

In addition, substantial evidence exists for the ALJ to discount Dr. Estock's opinion. As the ALJ explained, Dr. Estock's "failure to identify trauma related disorder as a severe problem [for Johnson] undermines" his medical opinion. (Tr. 19). To wit, Dr. Estock only diagnosed degenerative disc disease and depression as severe problems for Johnson. (Tr. 71). However, the medical evidence demonstrates Johnson's treatment for PTSD since December 4, 2017. (Tr. 303-08, 329-30, 337, 405, 429, 438-

446, 450-454, 460, 502, 511-17, 519-522, 529-36, 558-69, 572-75, 579-85, 634-37, 646-53, 701-714).   Furthermore, Dr. Sims determined Johnson severely suffers from a trauma and stressor related disorder vis-à-vis PTSD, along with degenerative disc disease, depression, and substance addiction.  (Tr. 86-88).

Finally, Johnson avers that the ALJ found Gloria L. Sellman's, M.D., and Thomas G. Amason's, M.D., medical opinions "mostly persuasive."   (Tr. 18). Specifically, the ALJ opined

> Drs. Gloria Sellman and Thomas Amason reviewed the claimant's records and concluded that the claimant is limited to light exertion with frequent postural movements (but no climbing of ladders) and must avoid all exposure to hazards. . . . These opinions are consistent with the evidence showing right hip problems and obesity. However, I added additional postural limitations to accommodate the effects of the claimant's combination of ailment on his gait and mobility. In addition, I added the need for a cane based on Dr. Qureshi's statement. These opinions are mostly persuasive.

(*Id.*).  Johnson contends that the "ALJ does not mention or consider the specialty of these physicians as an anesthesiologist and pediatrician, specialties not involved in treatment of orthopedic or sleep related medical diagnoses, as called for under 20 C.F.R. § 404.1527[c](c)(4)."  (Doc. 18 at 9).[5]

Title 20 C.F.R. § 404.1520c(c)(4) states,

> The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or

---

[5] "For claims filed . . . on or after March 27, 2017, [§ 404.1520c applies]. For claims filed before March 27, 2017, the rules in § 404.1527 apply." 20 C.F.R. § 404.1520c.  Johnson filed his claim on September 10, 2019, thus § 404.1520c applies.  (Tr. 179-80).

her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

Dr. Sellman and Dr. Amason maintain positions as medical consultants. "A medical consultant is a member of a team that makes disability determinations in a State agency . . . , or who is a member of a team that makes disability determinations for [the SSA] when [the SSA] make[s] disability determinations." 20 C.F.R. § 404.1616. "The medical consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all physical impairment(s) in a claim." *Id.*

"The opinions of agency [medical] consultants may be considered medical opinions, and their findings and evidence are treated similarly to the medical opinion of any other source." *Gordon v. Saul*, No. 8:18-CV-829-T-SPF, 2019 WL 4254470, at *5 (M.D. Fla. Sept. 9, 2019) (citing 20 C.F.R. §§ 404.1513a(b), 416.913a(b)). Pursuant to this regulatory guidance, the ALJ did not err in considering Dr. Sellman's and Dr. Amason's medical opinions and findings.

Substantial evidence also supports the ALJ's reliance upon Dr. Sellman's and Dr. Amason's opinions. The VA on August 22, 2019, found Johnson had "[r]ight trochanteric bursitis" and "[m]ild to moderate degenerative arthropathy involving the right hip joint superiorly and axially, without marrow edema or subchondral cyst formation." (Tr. 467). In addition, the VA found no evidence of an acute fracture, avascular necrosis, acetabular labral tear, or significant joint effusion. (*Id.*). Johnson then reported to the VA on April 14, 2020, that his hip injection from January 2, 2022,

had been 100% effective in alleviating his hip pain.  (Tr. 438).

Moreover, "[t]he record demonstrates that the ALJ did not unconditionally adopt those non-treating opinions because the ALJ found that [Johnson] was more limited than those opinions concluded." *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013).  Johnson points to no other medical evidence to undermine the persuasiveness of Dr. Sellman's and Dr. Amason's medical opinions and findings.  In fact, Johnson states "there are no examining or treating source medical statements in the record providing an opinion as to physical RFC."  (Doc. 18 at 8-9).

Therefore, the ALJ did not err in his assessment of Johnson's RFC in this regard as well.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 15th day of September, 2022.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE